**ASSOCIATES DISCOUNT CORPORATION, Plaintiff,**

v.

**TUNE CONSTRUCTION COMPANY, Inc., Defendant.**

**Civ. A. No. 1582.**

United States District Court
W. D. Arkansas,
Fort Smith Division.
March 20, 1961.

694

Owens, McHaney & McHaney, Barber, Henry, Thurman & McCaskill, Little Rock, Ark., for plaintiff.

Dickson, Putman & Millwee, Fayetteville, Ark., for defendant.

JOHN E. MILLER, Chief Judge.

This is a replevin action brought by the plaintiff, Associates Discount Corporation, hereinafter designated as Associates or plaintiff, against the defendant, Tune Construction Company, Inc., hereinafter referred to as Tune or defendant, to recover possession of a 1960 Allis-Chalmers tractor with dozer, model HD–11E, together with damages for retention of the tractor.

The plaintiff is an Indiana corporation, having its principal place of business at South Bend, Indiana. The defendant, Tune, is a corporation organized and existing under the laws of the State of Arkansas, with its principal place of business at Fayetteville, Arkansas. The matter in controversy exceeds the jurisdictional amount exclusive of interest and costs.

The plaintiff alleges that the defendant purchased the tractor in question from Kern-Limerick, Inc., hereinafter referred to as Kern-Limerick, an Allis-Chalmers dealer in Little Rock, Arkansas, and that as partial consideration for the tractor, the defendant executed its promissory note in the sum of $14,620.78 due May 13, 1960, and that Kern-Limerick retained title to the tractor pursuant to the terms of the conditional sales contract executed by the defendant. It is further alleged that the note and sales contract were transferred and assigned for consideration to the plaintiff, that the plaintiff notified the defendant of such an assignment, and that the defendant has failed to make such payment although demand has been made.

The defendant admits the execution of the note and conditional sales contract, but alleges that it paid the balance due on the note to Kern-Limerick; that Kern-Limerick was an agent of the plaintiff for the purpose of receiving such payment, and that the action of Kern-Limerick in collecting the balance due was ratified and confirmed by the plaintiff.

The case was tried to the court on February 16, 1961, and at the conclusion of the trial the case was submitted and briefs were requested from each side. The briefs have been received and considered by the court, along with the pleadings, testimony, exhibits and entire record. Findings of fact and conclusions of law are included in this opinion in accordance with the provisions of Rule 52 (a), Fed.R.Civ.P. 28 U.S.C.A.

The material and relevant facts of the transaction between Tune, Kern-Limerick, and Associates are not in conflict. Tune is a leading contracting firm in northwest Arkansas. Mr. Carl Tune is the founder, president, and chief executive officer of the corporation. Tune had done business for many years with Kern-Limerick, purchasing at various times almost its entire fleet of heavy equipment from Kern-Limerick. Prior to the purchase of the equipment in question here, Tune had paid cash for all equipment purchased from Kern-Limerick.

In March 1960, Carl Tune was in Little Rock at the offices of Kern-Limerick and examined the tractor with dozer, model HD–11E, which was in stock. Mr. Tune discussed the price of the equipment with R. C. Limerick, Jr., President of Kern-Limerick. The price quoted was in excess of $21,000 and Mr. Tune felt this was excessive. In negotiating with Kern-Limerick, Tune stated that if he decided to purchase the tractor, he would pay cash, but before doing so desired to make certain that it would satisfactorily perform the tasks for which he intended to use it, and that he would only pay upon delivery $5,000 of the agreed purchase

price and would pay the remainder in thirty days if the machine proved satisfactory. Mr. Limerick agreed to such terms if they were able to agree on the price.

Mr. Tune returned to Fayetteville, and several weeks later received a telephone call from Ray Harrison, a salesman for Kern-Limerick. Harrison called at the direction of R. C. Limerick, Jr. Harrison quoted Tune a price of $19,500 for the tractor and Tune agreed to purchase it. At that time it was specifically understood that Tune would pay $5,000 upon delivery and the balance of $14,500 in thirty days, and that Tune would not be charged any finance fees or delivery charges. R. C. Limerick explained to Tune that Kern-Limerick was required to make payment to Allis-Chalmers of the total amount due them on the tractor within two weeks from the date of the sale, and that it would be necessary for some sort of financing arrangement to be worked out. Tune agreed to such arrangements upon condition that the Tune Construction Company would not have to pay any finance charges. This was agreed to by Kern-Limerick.

Limerick contacted the plaintiff through its local office in Little Rock, and after conducting a credit investigation of Tune, plaintiff agreed to finance the balance of the cost of the tractor on a 30-day loan.

The tractor was delivered to Tune in Fayetteville, Arkansas, on April 14, 1960. Ray Harrison accompanied the truck which delivered the tractor. Upon arrival at Fayetteville, Harrison went to the Tune office, but Carl Tune was at a job site so Harrison discussed the matter with Jack Burge, the Secretary-Treasurer of Tune. Mr. Burge supervises all of the office work for Tune, and in addition is a licensed attorney. Harrison presented Burge with the conditional sales contract which had been signed by R. C. Limerick the day before, and to which was attached a promissory note that had been prepared by Kern-Limerick. Burge did not read the conditional sales contract or the attached note. He knew the

transaction was to be for cash, and testified that he thought the contract was an invoice and delivery receipt at the time he signed. Simultaneously therewith he issued a check for $5,000, dated April 14, 1960, and marked "down payment on HD–11E#5867," and expected to pay the balance in two or three weeks after the equipment had been fully tested and found satisfactory. As heretofore stated, the note was for $14,620.78, but it is admitted that $120.78 finance charges had been added to the note. After the papers had been signed, the tractor was delivered to Tune at a nearby job site.

The conditional sales contract and the note were subsequently assigned by Kern-Limerick to the plaintiff with full recourse. Following the assignment, the Little Rock office of the plaintiff corporation sent the information to the home office at South Bend, Indiana, and two weeks later the home office of the plaintiff sent an undated form letter to Tune, advising it that the conditional sales contract and note had been assigned to Associates. Accompanying the form letter was a coupon book containing one coupon in the amount of $14,620.78. On the front of the coupon book was the notation that payment should be made to Associates at its Little Rock office.

Upon receipt of the letter and the coupon book, Jack Burge placed a long distance telephone call to R. C. Limerick, Jr., inquiring about the additional $120.-78 which the coupon reflected was owed. Limerick informed Burge that the additional charge was a finance fee and that it would be borne by Kern-Limerick. Later, on May 10, 1960, Burge again called Limerick and asked how to handle the payment. Limerick told him to send a check for $14,500 to Kern-Limerick, and that Kern-Limerick would pay the additional $120.78 finance charge. Burge then sent a Tune check in the amount of $14,500 to Kern-Limerick on May 10, 1960. The check was marked "balance on HD–11E."

The check was received by Kern-Limerick and deposited to its account. On May 12, 1960, Kern-Limerick sent its own

check for $14,620.78, drawn on the First National Bank of Little Rock, to the plaintiff. No notation was made on the check indicating the purpose for which it was sent, and no cover letter accompanied the check. It was the usual practice in cases of this nature for Kern-Limerick to call the local representative of Associates and advise Associates to which account the check should be credited.

Associates received the check and credited it to the Tune account, marking the account paid in full. The plaintiff deposited the Kern-Limerick check in the Worthen Bank and Trust Company of Little Rock, and on May 16, 1960, the Worthen Bank endorsed the check. The check was returned to the Worthen Bank and to Associates on May 18, 1960, marked "not sufficient funds."

At the time R. C. Limerick, Jr., drew the check, payable to Associates, he realized that another check was outstanding payable to the Allis-Chalmers Company, and that Kern-Limerick did not have sufficient funds in the bank to cover both the Allis-Chalmers check and the Associates check. However, Limerick had made arrangements with Allis-Chalmers to advance Kern-Limerick additional credit, and so Limerick called the First National Bank and directed them not to honor the Allis-Chalmers check but to honor the Associates check. No stop-payment order was made. However, when the check payable to Allis-Chalmers reached the bank, it was paid, leaving insufficient funds in the Kern-Limerick account to cover the Associates check.

On May 19, 1960, Kern-Limerick closed the doors of its place of business, and a few days later filed its petition in voluntary bankruptcy. The bankruptcy proceedings are currently pending in the United States District Court for the Eastern District of Arkansas.

When it became apparent that Kern-Limerick was in serious financial difficulty, Eugene Lusk, Collection Manager of the Commericial Division of the plaintiff, came to Little Rock from its principal office in South Bend, Indiana. Upon the return of the Kern-Limerick check,

the plaintiff changed its account books to reflect a balance due on the Tune account of $14,620.78. On May 21, 1960, Lusk called Carl Tune in Fayetteville demanding payment of that amount. This was the first information that Carl Tune received relative to the financial status of Kern-Limerick, and he declined to pay the amount demanded, stating that the account had been paid through Kern-Limerick.

The testimony relative to the relationship between Associates and Kern-Limerick is somewhat in dispute. After reviewing and considering all the testimony, the court finds the facts on this issue to be as follows.

On September 13, 1957, Associates and Kern-Limerick entered into a written contract, in which Kern-Limerick, inter alia, agreed:

"In consideration of the purchase by you of such Notes as may be acceptable to you, all of which shall be endorsed 'without recourse', we hereby agree that if you repossess or recover any equipment covered by said Notes, for any reason, we will, upon tender of delivery to us at the place of repossession or recovery, repurchase such equipment, as is, from you, for cash at a price equal to the then unpaid balance owing on the Notes relating thereto plus all reasonable costs and expenses, including attorney's fees, incurred by you in effecting such repossession or recovery. Until repurchased by us, you may store such repossessed equipment on our premises without cost, and our possession of such equipment will be merely as a bailee with the duty to safely store for you and redeliver such equipment to you on demand.

"It is understood that we will have one hundred twenty (120) days from date of repossession to repurchase such repossessed equipment, however, we will pay to you, at the time of repossession, a sufficient amount to bring the account into a current

position, and we will make monthly payments until paid in full."

\* \* \* \* \* \*

"7. We waive presentment, demand, notice and protest on all paper, and all other demands and notice, and consent that you may grant extensions of time, make compromises with and release the obligor and other person liable on the paper, and otherwise handle the making of collections in accordance with your business judgment, without affecting our liability hereunder. You may hold and apply any money, profit or instruments of ours which come into your possession for any amounts owing by us to you."

Amendment No. 1 to the basic contract was added on November 25, 1959, and in which plaintiff agreed in part as follows:

"At your request and in consideration of your continuing to offer to sell to us time payment paper under the Industrial Equipment Plan executed between us as of the 13th day of September, 1957, we hereby agree that your liability to us under said Plan for the repurchase of all paper purchased by us up to and including December 31, 1959, shall be limited to a maximum aggregate amount equal to 50% of the sum of the outstanding time balances on all paper purchased by us up to and including December 31, 1959, or the sum of $250,000.00, whichever amount is greater. Thereafter, the maximum aggregate amount of your liability under said Plan for the repurchase of paper during each succeeding twelve month period shall be an amount equal to the sum of (1) 50% of the sum of the original time balance on all paper purchased by us before January 1, 1960, which was outstanding on the first day of such period, provided however, that your liability for the repurchase of paper shall not be less than $250,000.00 during each twelve month period."

The plaintiff maintained a branch office in Little Rock, of which C. F. Rice was the Manager. The business relationship between the plaintiff and Kern-Limerick was very satisfactory, and as time passed Kern-Limerick sold larger amounts of its paper to the plaintiff. During the last 18 months of the business operations of Kern-Limerick, 80 percent of all its paper was sold to the plaintiff. Between September 1957 and May 1960, some 376 conditional sales contracts and accompanying notes were assigned by Kern-Limerick to the plaintiff for financing purposes.

The customary procedure followed in these transactions was for Kern-Limerick to first make a tentative agreement with the prospective equipment buyer. Kern-Limerick would then call the plaintiff and explain the terms of the tentative agreement, including such information as the name of the prospective purchaser, the type of equipment to be purchased, the length of time desired for payment, and any other pertinent information. The plaintiff would then conduct its independent credit investigation of the prospective buyer, and if it appeared that the prospective purchaser was a good credit risk, would notify Kern-Limerick to proceed with the transaction. Kern-Limerick would then take a down payment from the buyer and a note for the balance, plus interest. A conditional sales contract was the usual security device employed; however, on occasions a chattel mortgage would be used. The forms for the note, conditional sales contract and chattel mortgage were all furnished to Kern-Limerick by the plaintiff. After the transaction had been completed between the buyer and Kern-Limerick, the latter would assign the note and security instrument to the plaintiff with full recourse.

Kern-Limerick maintained separate account records on all paper assigned to the plaintiff, and the plaintiff furnished Kern-Limerick with daily payment reports. Therefore, Kern-Limerick was able to know the exact status of the accounts each day, and knew immediately when any of the accounts were in default.

The branch office of the plaintiff in Little Rock had four employees available for collection work. When an account became three days' delinquent, a form reminder notice was sent to the buyer. If the account remained delinquent at the end of seven days, a second reminder notice was sent, and frequently a phone call was made to the buyer. At the end of ten days a personal letter was sent to the buyer, and one of the plaintiff's collection men made a field visit. After an account became delinquent, the matter was discussed daily by telephone calls between the plaintiff and the office manager of Kern-Limerick. Associates solicited the assistance of Kern-Limerick in collecting delinquent accounts, and the office manager of Kern-Limerick devoted 90 percent of his time in assisting finance companies, such as the plaintiff, to collect accounts. Since 80 percent of Kern-Limerick's financing was done by the plaintiff during the last 18 months, a majority of the office manager's time was spent in assisting with the collection of accounts for Associates.

After an account had been delinquent for sometime, the matter of repossession of the equipment was discussed by representatives of Kern-Limerick and Associates. In the usual case no repossession was effected unless it was agreeable with both Associates and Kern-Limerick. On occasion, however, Kern-Limerick would act without prior approval of Associates in repossessing equipment. The actual repossession of all equipment was accomplished exclusively by Kern-Limerick, and after the equipment was repossessed, it was stored on Kern-Limerick's lot. Following repossession, Kern-Limerick would offer the equipment for sale, and in the usual case would sell it in the same manner in which new equipment was sold, that is, by having the plaintiff finance the transaction. On occasion, however, Kern-Limerick would sell repossessed equipment for cash and pay off the balance due Associates out of the sale price. At no time was any objection raised by Associates to the repossession of equipment by Kern-Limerick without prior approval by the plaintiff, and likewise no objection was ever offered to the practice of Kern-Limerick's selling the equipment without prior Associates' approval. It should also be noted that throughout the repossession process the note and security instrument were held by Associates, and were not reassigned to Kern-Limerick until the balance was paid in full.

Between September 1957 and May 1960, Kern-Limerick received payments from buyers of equipment whose notes and security instruments had been assigned to and were held by Associates. Kern-Limerick collected both delinquent and current payments in cash or by check. After a collection had been made by Kern-Limerick on notes held by Associates, the check was either endorsed by Kern-Limerick to Associates, or the proceeds deposited in the Kern-Limerick bank account and a check drawn by Kern-Limerick payable to Associates was mailed to plaintiff. At no time did Associates object to this procedure, and Kern-Limerick's help in collecting accounts was actively solicited by Associates. In at least one instance the buyer specifically demanded that he be allowed to make payments directly to Kern-Limerick, and this was at least tacitly agreed to by the plaintiff.

In the transaction under consideration, upon receipt of the check of Kern-Limerick on or about May 14, 1960 (the testimony does not show just when, but the check was deposited in the Worthen Bank by the plaintiff on or about May 16, 1960), the plaintiff on the date of the receipt of the check credited the Tune account with the amount of the Kern-Limerick check, thus reducing the balance to zero. Apparently the account stood as paid, showing no balance due, until Mr. Eugene Lusk, the Collection Manager of the plaintiff, arrived from the principal office at South Bend, Indiana, and after having made an investigation as to the financial status of Kern-Limerick, the plaintiff changed the Tune account to show a balance of $14,620.78 due.

The conditional sales contract before the court, inter alia, provides:

"Title to and ownership of property and any and all replacements and additions remain and continue in Seller and Seller's assigns until the total price is paid in full in cash. Seller may transfer or sell this agreement and note to Associates Discount Corporation, South Bend, Indiana, in which event Purchaser agrees to pay the unpaid balance owing hereunder to Associates Discount Corporation on due dates * * *."

The contract also shows "Total Time Price" to be $19,620.78, less a down payment of $5,000 leaving unpaid the balance of $14,620.78, "and the Purchaser promises to pay the unpaid Time Balance recited above to the Seller in 1 installment of $14,620.78 each and a final installment of $ None , beginning on May 13, 1960, and as evidenced by a promissory note of even date herewith made by the Purchaser and payable to the Seller." As heretofore set forth, the promissory note was attached to the conditional sales contract. The note is as follows:

"Promissory Note

" $14,620.78           Little Rock, Arkansas           April 13, 1960
(Total Amount of Note)      (City and State)               (Date)

"For Value Received, I Promise to Pay to the Order of
     Kern-Limerick, Inc.    Fourteen Thousand Six Hundred Twenty
         (Seller)

and 78/100 . . . . . . Dollars ($14,620.78) in 1 installments of $14,620.78
each and a final installment of $ None thereafter, the first installment being payable on the 13 day of May, 1960, at the office of Associates Discount Corporation, South Bend, Indiana, with interest after maturity at the highest legal rate plus costs of suit and reasonable attorney's fees (15% if permitted by law).

"If any installment of this note is not paid when due, then all unpaid installments shall immediately become due at the option of the holder hereof without notice or demand. The makers and endorsers hereby waive presentment, demand, notice of nonpayment, protest and notice of protest and relief from all insolvency, homestead, and exemption laws, and agree that any renewals will not release them or any of them.

"Tune Const. Co., Inc.           Seal           By /s/ Jack Burge   Seal

                                                       Sec. & Treas.
                                                (Title of officer, if corporation. If owner or partner, state which.)"

———◆———

The Secretary-Treasurer of the defendant corporation, Mr. Jack Burge, was fully advised that, as between Tune and Kern-Limerick, the total purchase price of the equipment was $19,500, but he proceeded to sign for the defendant corporation the conditional sales contract and promissory note, and thus obligated the defendant to pay $120.78 in excess of the agreed purchase price. It is true that Mr. Burge stated that he thought that he was signing an invoice and delivery receipt when he signed the contract and note, but Mr. Burge is an attorney, and the court is of the opinion that at the time he executed the contract

and note, he was familiar with the terms of the documents and, of course, knew that he was obligating the defendant to pay to Kern-Limerick, or to its order, the full sum of $14,620.78 on May 13, 1960. In addition to the provisions of the contract heretofore set forth, the contract further provides that the seller "shall assign this agreement and transfer title to said chattels to the Associates Discount Corporation," and the note also provides that it is payable "at the office of Associates Discount Corporation, South Bend, Indiana."

The note was endorsed as follows:

"Pay to the Order of Associates Discount Corporation with full recourse.

"Kern-Limerick, Inc.

(Seller)

"By /s/ R. C. Limerick, Jr.

Title-President.

"(Title of officer, if corporation. If owner or partner, state which.)"

In addition to being charged with knowledge of the provisions of the contract and note, the plaintiff sent an undated mimeographed letter to the defendant, which letter was received several days before the defendant sent its check to Kern-Limerick for $14,500.

The letter, inter alia, provides:

"Please be advised we have purchased and are the owners of the contract covering equipment you recently purchased or leased. * * *

"We are enclosing a payment book for your convenience in making payments. On the front cover is the address of our office, also your payment schedule. Kindly send your check each month with the related slip to the address shown for proper credit."

On May 10, 1960, the same Jack Burge, Secretary-Treasurer of the defendant, drew and sent to Kern-Limerick a check for $14,500, and along with the check sent the coupon that had been received by defendant from the plaintiff, which coupon showed that it was payment number one, due May 13, 1960, on the account of the Tune Construction Company, Inc., and also showed that the amount due plaintiff on that date was $14,620.78.

There is no doubt but that at the time Mr. Burge, the Secretary-Treasurer of the defendant, sent the check to Kern-Limerick for $14,500, the defendant knew that $14,620.78 would be due on the note within three days and that the note had been negotiated to the plaintiff. At that time the defendant was confident that Kern-Limerick would pay the plaintiff the balance of $120.78 due on the note. The payment made by the defendant to Kern-Limerick was in strict accordance with the agreement entered into between defendant and Kern-Limerick.

In Winer v. Bank of Blytheville, 1909, 89 Ark. 435, 117 S.W. 232, the court at page 448 of 89 Ark., at page 238 of 117 S.W. in quoting from the case of Jenkins v. Shinn, 1892, 55 Ark. 347, 18 S.W. 240 said:

"'If the maker of a negotiable note pays the same to the payee, who is not the holder, he is not discharged from his obligation to the indorsee and holder without showing, either that the payee was authorized to receive payment, or that the holder led him to believe that he was so authorized.'"

In Vance v. White, 1929, 180 Ark. 470, 21 S.W.2d 853, the court, beginning at the bottom of page 473 of 180 Ark., on page 855 of 21 S.W.2d said:

"The judgment in the case of Hamilton National Bank v. Emigh, 127 Ark. 545, 192 S.W. 913, 914, was reversed because of the refusal of the court to give an instruction reading as follows:

"'4. A maker of a promissory note is charged with the knowledge that the note is negotiable and may be transferred and indorsed by the person or firm to which it is payable to some third party or indorsee; and when such maker pays the person to whom said note was originally payable the amount of the said note, or any part thereof, without the pro-

duction of the original note, such payment is made at the maker's peril, and such payments so made are of no effect as against the third party or indorsee thereof who had possession of the note at the time the payments were made.'

"This is an elementary principle in the law of commercial paper, and further citation of cases is not required, although many might be made, some quite recent."

The court also held that an endorsee is not required to notify the maker of the note that it was the legal holder of the note. On the contrary, it was the duty of the maker of the note to make payments to the legal holder, and payments otherwise made were made at his peril.

The defendant on its brief makes two contentions:

"(1) That Kern-Limerick, Inc., was, at the time of Tune Construction Company's payment to it, the impliedly authorized agent of Associates Discount Corporation for the purpose of collecting and receiving payment from defendant and other purchasers under similar contracts which had been assigned from Kern-Limerick to Associates.

"(2) That, in any event, Associates Discount Corporation ratified the collection and receipt by Kern-Limerick, Inc., of Tune Construction Company's payment on the assigned account."

The defendant makes no contention that the plaintiff is estopped. On the other hand, the defendant during the trial expressly disavowed any plea of estoppel. In effect, defendant admits that it was not familiar with the course of dealing between Kern-Limerick and the plaintiff and, of course, was not misled thereby, but does contend that the previous course of dealing between Kern-Limerick and the plaintiff, the prevailing practice of the plaintiff in knowingly permitting buyers to make payments to Kern-Limerick on similar contracts assigned to it, and acquiescence without objection to such practice, the active solicitation by plaintiff of Kern-Limerick's aid in making collections, and all the other pertinent facts and circumstances clearly show the existence of an actual implied principal-agency relationship between the plaintiff and Kern-Limerick.

In Koen v. Miller, 1912, 105 Ark. 152, 150 S.W. 411, the court was considering whether the plaintiff was estopped. Even though defendant makes no such contention here, the discussion by the court seems apposite to the contentions made by defendant. Beginning at the bottom of page 156 of 105 Ark., on page 412 of 150 S.W., the court said:

"* * * In the case at bar the defendant knew the note was negotiable, and knew that it was intended to pass from owner to owner by indorsement. He knew it was liable to pass at any moment, and that the last person thus receiving it could require at his hands the full amount of the note. He had only to see to it that he received his note when he paid his money.

"As stated in the case of Hollinshead v. John Stuart & Co., supra 8 N.D. 35, 77 N.W. 89, 42 L.R.A. 659; 'If he neglected this simple requirement, demanded no more by the law than by common prudence, he paid at his peril; and, if loss occurs, he must bear it. One party or the other must suffer, and he, being the party in fault, must bear the burden.'"

On page 157 of 105 Ark., on page 412 of 150 S.W., the court said:

"In the case of Bartel v. Brown, 104 Wis. 493, 80 N.W. 801, the court said: 'The importance of protecting the holders of commercial paper is so great that to warrant finding that a person who assumes to have authority to receive payment of the principal sum on any such paper has such authority, possession of the paper itself by such person, or proof aliunde of express authority, is indispensable. As said by the court in Smith v. Kidd, 68 N.Y. 130, 23 Am.Rep.

157: 'Any other practice would be dangerous in the extreme.' 'If money be due on a written security, it is the duty of the debtor to see that the person to whom he pays it is in possession of the security. That is the best evidence of authority. The payor is negligent if he relies on anything less, and must abide the event of being able to establish, by clear and satisfactory evidence, an express agreement between the holder of the security and the supposed agent, authorizing the latter to represent the former in the transaction. To that familiar doctrine there are many authorities, a large number of which are collated in Jones, Mortg. Sec. 964.' "

In Arkansas Valley Feed Mills v. Fox DeLuxe Foods, D.C., 171 F.Supp. 145, affirmed 8 Cir., 273 F.2d 804, this court said at page 157:

"Actual authority, of course, may exist because of express authority, either oral or written, delegated by the principal, in this case the corporation, or actual authority may derive from implication in the principal's words or deeds. See, Rest., Agency, Sec. 8d; cf. St. Louis I. M. & S. R. v. Jones, 96 Ark. 558, 132 S.W. 636, 37 L.R.A.,N.S., 418. Implied authority in this sense is a species of actual authority; and unlike apparent authority does not rest upon any concepts of estoppel, but upon the fact that authority is actually granted even though by implication. Thus, implied authority, although it may rest upon similar facts, is distinguished from apparent authority in that it is authority actually granted by the principal."

In discussing the question of the establishment of the relationship of principal and agent, the court in Pierce v. Smith, 1937, 193 Ark. 869, 103 S.W.2d 353, at page 871 of 193 Ark., at page 355 of 103 S.W.2d said:

"There is no presumption that McCarroll was the agent with the authority to do these things, but the burden is upon the person claiming that the agent has the authority, to make the proof of his authority. It is not necessary, however, that this be shown by direct evidence.

" 'As a general rule, whatever evidence has a tendency to prove an agency is admissible, even though such evidence may not be full and satisfactory. Direct evidence is not indispensable—indeed, frequently, it is not available; circumstances, such as the relation of the parties to each other and their conduct with reference to the subject matter of the contract, may be relied upon. It is also permissible to prove a previous course of dealing.' 2 Am.Jur. p. 351, § 443."

The defendant contends that the principles announced in the case of Kirkpatrick Finance Company v. Stotts, 1932, 185 Ark. 1089, 51 S.W.2d 512, when applied to the facts in the instant case clearly establish that Kern-Limerick was an actual agent of plaintiff with implied authority to collect and receive payments on behalf of plaintiff at the time the defendant made its payment to Kern-Limerick. A careful reading of the case discloses that the facts therein were materially and substantially different from the facts in the case at bar as found by the court.

On December 29, 1928, the appellee, Stotts, purchased a Ford automobile from the Jonesboro Machine Company of Jonesboro, Arkansas. He traded in an old automobile and paid some cash at the time of the purchase, leaving a balance of $360 due as the cash price of the new automobile. However, he signed a contract which stated that the total time price was $793.50; that the down payment was 50 percent and the amount of the note $396.70. The contract provided that this amount was to be paid in monthly installments of $39.67 each. The first installment was due January 29, 1929. The agreement between Stotts and the Machine Company, the seller, was that if paid in full within 30 days, the balance would be $360. In other words,

$36.70 finance charges were to be absorbed or paid by the seller, the Machine Company. Within 30 days, and on January 29, 1929, Stotts paid the Machine Company $360 on the contract. The contract provided that payments should be made to appellant Kirkpatrick Finance Company of St. Louis, Mo., which retained title to the automobile until paid. Stotts never at any time made a payment to the appellant, but the Jonesboro Machine Company, after receiving the $360 from Stotts, made five monthly payments of $39.67 each to the appellant, which reduced the amount due on the note to $198.35 with interest.

As a defense to the suit on the note to recover the balance, Stotts pleaded that he had paid the balance of $360 to the Machine Company, "which was the agent of the plaintiff for the purpose of receiving payments from defendant and sending same forward to plaintiff; that the Jonesboro Machine Company had authority to, and did, collect from the defendant and other purchasers under similar contracts, and that the Jonesboro Machine Company remitted plaintiff the first five payments on said contract."

At the time the conditional sales contract was assigned to the Finance Company, the promissory note was also endorsed to the Finance Company "without recourse." The case was tried to a jury, and the court instructed the jury as follows:

" 'You are instructed that the execution of said note having been admitted, the burden of proof is on the defendant to show that the indebtedness represented thereby has been paid in such manner as to discharge him from further liability thereon. There is no evidence in this case of express authority given to the Jonesboro Machine Company to accept payment of the note in question. Your verdict will therefore be for the plaintiff for. the sum sued for, unless you find by a preponderance of the evidence that the Jonesboro Machine Company's collection of the payment, if any, from the defendant

was ratified and confirmed by the plaintiff with full knowledge of all the facts."

The Supreme Court held that the evidence was sufficient to justify the trial court in submitting to the jury the question of agency, as well as ratification, but that the appellant could not complain at this not being done, because the instruction given by the court was as favorable to it as it was entitled to. Further, the court said at page 1097 of 185 Ark., at page 515 of 51 S.W.2d:

"Under a certain set of facts, a jury might find that the relation of principal and agent existed, without finding there was any ratification. If this had been submitted to the jury in the instant case, there would have been substantial evidence to justify a finding that the relation of principal and agent existed, but, as we have already said, the appellant cannot complain at this action of the court, and the appellee has made no objections to the court's refusal to instruct on the question of principal and agent."

The Jonesboro Machine Company sold on an average of 30 new cars per month, and half of the notes for the balance of the purchase price on these cars was bought by the Finance Company; that on more than half of the contracts held by the Finance Company, the purchasers would make their payments to the Machine Company and it would forward the money to the Finance Company. This practice continued up to the time of the bankruptcy of the Machine Company. The Finance Company, of course, knew that the Machine Company was collecting on the contracts, although it was not obligated to do so and was not liable to the Finance Company for any default that might be made by a purchaser.

The note sued upon in the instant case was endorsed by Kern-Limerick "with full recourse," whereas the note in the Kirkpatrick Finance Company case was endorsed "without recourse." Thus, the Jonesboro Machine Company was not liable to the Finance Company on the note

by reason of its endorsement, whereas in the instant case Kern-Limerick was liable by reason of its endorsement, and any collections made by Kern-Limerick on any contracts with other persons were made for its own benefit as well as for the benefit of the plaintiff.

As reflected by the facts heretofore set forth, the defendant Tune had for years bought practically all of the equipment required by it from Kern-Limerick. All the purchases had been for cash upon delivery, and the only reason Tune did not pay the entire purchase price of the equipment in this case at the time of delivery was that it was not sure that the equipment would do the work which Tune had undertaken to do. Thus Tune had not had any relationship with the plaintiff and, of course, was not advised of the relationship between Kern-Limerick and the plaintiff. Tune did not know how the business between plaintiff and Kern-Limerick was conducted. The collections made by Kern-Limerick on other transactions were doubtlessly made as an accommodation to its customers, and also for the purpose of reducing its liability to Associates by reason of its endorsement of the various security instruments and promissory notes.

■ The court has given careful consideration to all the facts and circumstances disclosed by the testimony, and without reiterating the facts as found and set forth hereinbefore, the court is definitely of the opinion that the defendant has not established that Kern-Limerick was the agent of the plaintiff for the purpose of making the collection from the defendant Tune. Exchange National Bank v. Steele, 1913, 109 Ark. 107, 158 S.W. 969.

The fact that Kern-Limerick received the check from Tune, which it cashed instead of endorsing the check and forwarding it to the plaintiff, along with its own check for $120.78, is not decisive. No doubt that procedure was followed because at that particular time, unknown, so far as the testimony shows, to either the plaintiff or defendant, Kern-Limerick was hard pressed for cash and badly needed the use of the plaintiff's check for $14,500 to temporarily relieve its financial situation.

■ Neither does the action of plaintiff, when it received the check of Kern-Limerick for $14,620.78, in crediting the Tune account with the same and thus showing a zero balance, establish a ratification by the plaintiff of the payment made by the defendant to Kern-Limerick. It must be remembered that the defendant knew the amount of ·its obligation to the plaintiff, and the law as well as common prudence required the defendant to pay the holder of the note and the security, and when the defendant failed to remit to the known holder of the note and security, it acted at its own peril, and as stated in Koen v. Miller, supra, the defendant "being the party in fault, must bear the burden." [105 Ark. 152, 150 S.W. 412]. As a matter of fact, Kern-Limerick had for years been known and recognized as a reputable and responsible heavy-equipment dealer. The defendant likewise is a reputable and financially responsible contractor. It has earned such reputation by fair and honest dealings. Prior to the transaction now under consideration, the defendant and Kern-Limerick had many business transactions. Both had literally complied with the terms of every agreement made by them. In the instant case the contract between the defendant and Kern-Limerick was that the defendant would pay the balance of $14,500 when the equipment had been tested and found satisfactory. It proved to be satisfactory, and prior to the due date of the note which Kern-Limerick had assigned to the plaintiff, the defendant chose to send its check for $14,500 payable to Kern-Limerick rather than to the plaintiff. Of course, the defendant thought Kern-Limerick would endorse the check to the plaintiff and send its check for the balance of $120.78 in full satisfaction of the debt due plaintiff, but the bankruptcy of Kern-Limerick was imminent, and instead of sending the defendant's check to the plaintiff, Kern-Limerick chose to cash the check and send its own check for the

total amount of $14,620.78. Thus, the defendant took the chance and knowingly failed to make the payment to the known holder of the note and security.

At the trial of the case the parties stipulated that the question of damages for the detention of the equipment should be postponed until the question of liability was determined. Therefore, judgment for plaintiff for the recovery of one 1960 Allis-Chalmers tractor with dozer, model HD–11E, bearing serial No. 5867, is being entered today, and providing, in accordance with Ark.Stat.Ann. Sec. 51–1102 (1947), that the defendant may pay the plaintiff the face amount of the note with interest at 6 percent from May 13, 1960, together with court costs, in ten days from this date and retain the property.